# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

GLORIA JUANITA OCTAVE  :
*ADMINISTRATRIX* of     :
the ESTATE OF LUTALO OCTAVE, :
          :
  Plaintiff,      :
          :
v.           :  Case No.: 3:16-cv-338 – JAG
          :
SHERIFF MICHAEL L. WADE,  :  JURY TRIAL DEMANDED
          :
AUGUSTUS EDWARDS,    :
          :
SARA TOLENTINO,     :
          :
ASHLEY RHOADES,     :
          :
CHRISTINE SCHEIN,    :
          :
LOUIS FOX,       :
          :
and         :
          :
JOHN DOE(S) JAIL STAFF   :
          :
    Defendants.   :

## COMPLAINT

COMES NOW Plaintiff, Gloria Juanita Octave ("Plaintiff" or "Mrs. Octave") as *Administratrix* of the Estate of Lutalo Octave (the "Estate") by counsel, and moves this honorable Court for judgment against Sheriff Michael L. Wade ("Wade"), Augustus Edwards, Sara Tolentino, Ashley Rhoades, Christine Schein, Louis Fox, and John Doe(s) Jail Staff. In support of her Complaint, Plaintiff states as follows:

<u>**INTRODUCTION**</u>

1.      This Complaint asserts claims pursuant to 42 U.S.C. § 1983, as well as claims pursuant to Virginia's wrongful-death and survival claims statutes, regarding the death of Lutalo Octave.

2.      Lutalo Octave is survived by statutory beneficiaries under Virginia's wrongful death statute (Virginia Code § 8.01-50 and § 8.01-53).

3.      This Complaint details violations of the Fourteenth Amendment of the Constitution of the United States of America by Defendants, jointly and severally, occurring in the Henrico County Regional Jail West ("County Jail").

4.      This Complaint further details gross negligence by the Defendants, all of whom are responsible, jointly and severally, for gross negligence under Virginia state law resulting in Lutalo's death.

5.      Defendant Wade was responsible for operating the County Jail so as to not endanger the health and safety of those incarcerated or detained there. Wade failed to provide constitutionally adequate healthcare and housing to inmates detained there, including Lutalo.

6.      Collectively, Defendants failed to provide necessary, adequate and timely medical care and/or attention in response to Lutalo's serious medical needs. Through action and inaction, Defendants failed to prevent and directly caused Lutalo's fatal injuries through their gross negligence and deliberate indifference to human life, in violation of his constitutional rights.

## JURISDICTION

7.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over Lutalo Octave's 42 U.S.C. § 1983 claims.

8.     This Court has jurisdiction over these claims as they arise under the Constitution of the United States of America and have been brought before this Court pursuant to 42 U.S.C. § 1983.

9.     This Court has supplemental jurisdiction over the related state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the alleged claims arising under Virginia law are so related as to form part of the same case or controversy arising under Lutalo Octave's 42 U.S.C. § 1983 claims.

## VENUE

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to the Estate's claims occurred in this District.

11.    Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## PARTIES

12.    Plaintiff Gloria Octave is a citizen of the United States, and is a resident of Henrico County, Virginia.  She is the Personal Representative of the Estate of Lutalo Octave, deceased.  Letters of Administration were granted to Mrs. Octave by the Circuit Court of Henrico County on December 4, 2015.

13.     Mrs. Octave has brought this action in her capacity as Personal Representative of the Estate of Lutalo Octave.

14.     The Plaintiff's decedent is Lutalo Octave, who at the time of his death, was a nineteen year old citizen of the United States, and a resident of Henrico County, Virginia. Lutalo died on September 19, 2015 as a result of wrongful and unconstitutional acts of the defendants.

15.     At the time of the incident, Defendant Michael Wade was Sheriff of Henrico County.  In that capacity, Wade was charged with providing security for Henrico's two regional jails, including the County Jail in which Lutalo died.  At all times while Lutalo was detained at the County Jail, Sheriff Wade had a duty to maintain the custody and ensure the care of Lutalo, and otherwise delegated that duty to his deputies, agents and employees. Sheriff Wade is the official responsible for setting and enforcing the policies, customs, and practices of the County Jail.  Sheriff Wade is sued in his individual and official capacities for his own culpable action or inaction in the training, supervision, or control of his subordinates and for his acquiescence in the constitutional deprivations which this Complaint alleges, and for conduct that showed a reckless or callous indifference to the rights of others.  Sheriff Wade is sued in his individual and official capacities as charged herein.

16.     At the time of the incident, Defendant Louis Fox ("Dr. Fox") was the only licensed clinical psychologist ("LCP") working with the County Jail medical staff who met with Lutalo.  As the only LCP overseeing Lutalo's care and treatment, Dr. Fox had a duty to ensure proper supervision of his subordinates as they interacted with Lutalo.

17.     At the time of the incident, Defendant Sara Tolentino ("Ms. Tolentino") was a member of the County Jail medical staff. Ms. Tolentino was the last person to record a conversation with Lutalo before his death. During this conversation, Lutalo indicated that he was having consistent and regular thoughts of self-harm as well as continued auditory hallucinations. Despite this report, as well as four weeks of previous reports of potential self-harm, Ms. Tolentino failed to ensure that Lutalo be placed on 1:1 suicide watch and further failed to take other necessary steps to ensure that Lutalo received proper attention and care.

18.     At the time of the incident, Defendant Christine Schein ("Ms. Schein") was a licensed clinical social worker and a member of the County Jail medical staff. Ms. Schein spoke to Mrs. Octave on two occasions. During each conversation, Mrs. Octave explained her fears that Lutalo needed inpatient medical treatment at a hospital. Despite these pleas from Mrs. Octave, as well as weeks of previous reports of potential self-harm, Ms. Schein failed to ensure that Lutalo be placed on 1:1 suicide watch and further failed to take other necessary steps to ensure that Lutalo received proper attention and care.

19.     At the time of the incident, Defendant Augustus Edwards ("Mr. Edwards") was a member of the County Jail medical staff. Mr. Edwards spoke with Lutalo regularly and learned that Lutalo openly wanted to die and was seeking for a legal way to kill himself. Despite Lutalo's obvious medical condition and serious threat of self-harm, Mr. Edwards chose to remove Lutalo from 1:1 suicide watch and onto 30 minute watch, where Lutalo eventually hanged himself. Mr. Edwards failed to take necessary steps to ensure that Lutalo received proper attention and care.

20.     At the time of the incident, Defendant Ashley Rhoades ("Nurse Rhoades") was a nurse practitioner working for the County Jail medical staff.  Less than one week before his suicide, Lutalo told Nurse Rhoades that he could not contract for his own safety and that he would harm himself if given the means to do so.  Despite this statement from Lutalo, Nurse Rhoades failed to ensure that Lutalo was placed in a safe cell which lacked the means for accomplishing self-harm, failed to ensure that Lutalo be placed on 1:1 suicide watch, and further failed to take other necessary steps to ensure that Lutalo received proper attention and care.

21.     Defendants Dr. Fox, Ms. Tolentino, Mr. Edwards, Ms. Schein, and Nurse Rhoades, shall be collectively referred to as "Medical Staff Defendants."

22.     At the time of this Complaint, there were employees of the County Jail who worked as jailers whose identities are unknown.  As jailers, it was their duty to operate the County Jail and to supervise, monitor, and provide medical treatment to the inmates and detainees.  Lutalo Octave died in a camera cell, meaning that jailers had access to, but did not adequately use, video surveillance which could have prevented his death.  Upon information and belief, these jailers (hereinafter "John Doe(s)"), failed to properly watch Lutalo despite obvious and known signs of mental distress and suicidal tendencies.

23.     All Defendants are persons acting under color of state law pursuant to 42 U.S.C.  § 1983.

## FACTS

24.     Lutalo Octave was born on August 30, 1996.

25.     Lutalo was the son of Gloria Octave, the Plaintiff.  He was, at the time of his arrest, living with his parents in their home in Henrico County.

26.     Lutalo was arrested and housed at the County Jail on or about August 14, 2015 as a pre-trial detainee.

27.     At the time of his death, Lutalo suffered from a serious medical condition. In particular, he suffered from a psychiatric disorder, was depressed and suicidal. Shortly before his death, he had been diagnosed as suffering from schizophreniform disorder, a form of psychosis with a known correlation to increased risk of suicide.

28.     At the time of his entry into the County Jail, Lutalo was physically healthy. Lutalo's intake report did not note any major medical problems and he was cleared to be placed in the County Jail's general population.

29.     On August 19, 2015, Mrs. Octave and her friend Pastor Gail Townes called the jail to request that Lutalo be given a mental health evaluation. Mrs. Octave informed jail staff that Lutalo had recently dropped out of school, and that he had started acting aloof, quiet, withdrawn, and otherwise unusual. She advised Ms. Schein that Lutalo's crime, setting fire to his own home, was extremely unusual and out of character.

30.     Later that day, Lutalo was given a brief mental health evaluation by jail medical staff. The staff member, Mr. Edwards, noted that Lutalo was engaged in a process called "thought blocking" and that he was giving repetitive, confusing answers to his questions.

31.     On August 20, 2015, Lutalo was given a follow-up mental health evaluation by Nurse Rhoades. She noted Lutalo as being guarded, paranoid, and "thought blocking." Lutalo explained that he had hallucinations, may have been experiencing delusions, and that he "noticed things" that no one else notices. Lutalo requested help from doctors to "stop the voices."

32.     After this meeting with Nurse Rhoades, Lutalo was prescribed Haldol and Cogentin.

33.     On August 25, 2015, Lutalo met with Mr. Edwards again. During this meeting, Mr. Edwards noted that Lutalo was having thoughts of self-harm and had difficulty thinking of reasons to live.

34.     On August 26, 2015, Lutalo was seen by another member of the medical staff, Christine Gray, at the request of booking, due to reports of strange behavior and continued hearing of voices.

35.     On August 27, 2015, Mr. Edwards noted Lutalo's reasons for leaving his studies at the Virginia Commonwealth University. According to Lutalo, the government had implanted nanotechnology in his brain during a protest he attended. He reported that he was experiencing loud noises in his head and suffering from involuntary movements. Lutalo also reported that the voices in his head were getting louder and actively giving him commands. Lutalo further indicated that shortly before his incarceration, a friend of his father possibly had sexually harassed him, but that only he could see what this friend was doing to him.

36.     Also on August 27, 2015, Ms. Schein, informed Plaintiff that her son had had "his first psychotic episode."

37.     On August 28, 2015, Dr. Fox diagnosed Lutalo as suffering from schizophreniform disorder. Schizophreniform disorder is a form of psychosis with symptoms similar to schizophrenia.

38.    People suffering from schizophreniform disorder, particularly those suffering from their first episode of psychosis, are at a substantially increased risk of suicide.

39.    On August 29, 2015, Nurse Deborah Taylor noted that Lutalo indicated he "has nothing to live for" and wanted to commit suicide.  She noted that Lutalo had asked a doctor about assisted suicide and requested to be transferred to a state where he could receive such assistance.  Lutalo stated that all he could think about was wanting to die.  At this point, Lutalo was moved into 1:1 suicide watch due to his suicidal statements.

40.    On August 31, 2015, in a meeting with another member of the medical staff, Jessica Henderson, Lutalo was asked about his previous statements on assisted suicide. Lutalo admitted that he had been seeking information on how he might legally kill himself. Lutalo reported that he was feeling depressed and hopeless and that suicidal ideation "comes and goes." During this meeting, Lutalo stated "I just don't want to live" and requested transfer to a state that allows assisted suicide.

41.    Also on August 31, 2015, the same day that Lutalo stated "I just don't want to live" and requested a transfer to a state which would assist him in committing suicide, Lutalo was inexplicably cleared for transfer by Mr. Edwards out of 1:1 Mental Health Watch into the Mental Health Dayroom, with instructions to watch him once every 30 minutes "with no restrictions."

42.    Lutalo's patient encounter records obtained from the Medical Staff do not indicate that anyone met with him between August 31 and September 9, 2015.

43.    On September 9, 2015, Lutalo told Mr. Edwards that he currently had suicidal ideation and would allow someone else to hurt him.

44. On September 10, 2015, in a conversation with Ms. Tolentino, Lutalo explained that he was still hearing voices. *Lutalo told Ms. Tolentino that he had recently had suicidal thoughts and that if he were to harm himself, he would do so by hanging himself.* During this meeting, Lutalo requested a transfer away from general population to isolation so he could be alone. Ms. Tolentino recommended that Lutalo be relocated to a camera cell for "improved supervision."

45. On September 11, 2015, Lutalo was transferred to a camera cell and was placed on 30 minute watch. Despite Ms. Tolentino's recommendation that Lutalo have "improved supervision," Lutalo remained on 30 minute watch, *the same watch intervals he had been on before explaining to her that he might harm himself by hanging.* Ms. Tolentino did not order any restrictions for Lutalo's camera cell.

46. Plaintiff has a reasonable basis to believe that the camera in Lutalo's camera cell, the basis for providing him with "improved supervision," was not properly functioning at the time of his death.

47. A September 11, 2015 "Psychiatry Note" indicates that Lutalo was experiencing continued symptoms of depression. The "Psychiatry Note" further indicates that *Lutalo denied having the means to kill himself, but could not "contract for safety" if he were to acquire the means to kill himself.*

48. In spite of Lutalo's statement that he might kill himself if given the means to do so, Nurse Rhoades did not order Lutalo to be moved onto a more frequent watch cycle or that any restrictions be placed on his cell, such as removing the bedsheets or any other means by which a detainee might commit suicide.

49.     On September 16, 2015, Mrs. Octave contacted the County Jail again and talked with Ms. Schein.  Plaintiff indicated that her son, Lutalo, should be transferred to the Medical College of Virginia for inpatient treatment.  Plaintiff was informed that the jail could not transfer him there without a judge authorizing Lutalo's release.

50.     On September 16, 2016, Lutalo requested that he be moved back to general population but was not approved for transfer.

51.     On September 17, 2016, Lutalo reported to Ms. Tolentino that he was still having auditory hallucinations and that he must "distract himself" in order to get rid of these thoughts.  Lutalo stated that he had thoughts of self-harm once or twice per hour.  Despite Lutalo's continued hallucinations, thoughts of self-harm, and his report from one week earlier that he might hang himself, Lutalo was left in the poorly functioning camera cell on 30 minute watch.  The cell had a high shelf on the wall.  He was given a bedsheet.

52.     On September 19, 2016, Lutalo was found hanging from a bedsheet in his cell.  He was found at 11:56 AM, 23 minutes after his most recent check-in by guards.  After attempted revival by first responders, Lutalo was taken to the hospital where his death was pronounced at 12:42 PM.

53.     At the time of Lutalo's death, he was suffering from schizophreniform disorder, an objectively serious mental disorder which altered his ability to make decisions.  Thus, Lutalo was not of sound mind at the time of his death and did not voluntarily end his own life.

54.     Following Lutalo's death, Defendant Wade was quoted in the media stating, "Mental health staff had met with him he talked about a number of things that he wanted

to do… He promised them he was going to hurt himself." <u>See</u> http://wtvr.com/2015/09/23/lutalo-octave-suicide-henrico-county/

## DEFENDANTS' DUTIES

55.     At all times relevant to this action, all Defendants had duties to Lutalo Octave, an inmate, pursuant to the Fourteenth Amendment of the United States Constitution and also under Virginia law as described herein.

56.     Defendants Wade, Medical Staff, and John Doe(s) were required to provide Lutalo, and all other inmates/detainees, with constitutionally appropriate access to medical care and constitutionally appropriate housing.  All Defendants were obligated to take reasonable measures to provide for Lutalo's safety.

57.     Defendants Wade and John Doe(s) also owed statutory and common law duties of care to Lutalo, including affirmative duties to provide adequate and safe conditions of detention.

58.     Defendant(s) John Doe(s), as jail staff, have a constitutional duty not to act with deliberate indifference toward the legitimate medical needs of all inmates/detainees, including Lutalo.

59.     Defendant Wade has a constitutional obligation to not maintain, condone or otherwise permit perpetuation of policies and/or customs resulting in indifference to the medical needs or conditions of confinement of those housed in the County Jail.

60.     Particularly, Defendant Wade is responsible for the day-to-day operations and maintenance of the County Jail.

61.     Defendant Wade had the duty of care and custody for Lutalo.  While Lutalo was confined in the County Jail, he was in the custody and under the care of Defendant Wade and his deputies, employees and agents, including Defendants.

62.     Defendant Wade, by and through his deputies and Medical Staff Defendants, had statutory duties to provide proper medical treatment to Lutalo under Virginia Code § 53.1-126.  Under that statute, the Sheriff and jail personnel have a specific responsibility to inmates/detainees that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions."

63.     At all times relevant to the allegations in this Complaint, probable cause existed to support the belief that Lutalo was substantially likely to harm himself as a result of his mental illness, as evidenced by his recent behavior, and that he required treatment in a hospital.  Defendant Wade had notice of this probable cause, as evidenced by reports to the media shortly following Lutalo's tragic death:

> *Octave, who was prescribed medication for schizophrenia, was monitored by camera every 30 minutes at the jail. He had told officers he would commit suicide, which is why they were checking on him. However, he was not placed on 24-hour surveillance because officials said there was no need.*

> *"Mental health staff had met with him he talked about a number of things that he wanted to do," Henrico County Sheriff Mike Wade. "He promised them he was going to hurt himself. I mean that's the evaluation they do to determine whether someone is actually going to commit suicide."*

> *Wade said the number of individuals battling mental health issues in jail is increasing at a troubling rate and pointed out that even if inmates are properly diagnosed, prisoners can still refuse medication.*

<u>See</u>  http://wtvr.com/2015/09/23/lutalo-octave-suicide-henrico-county/.     Pursuant to Virginia Code § 19.2-169.6, Defendant Wade should have petitioned for hospital admission, but he failed or otherwise refused to do so.

64.     In connection with Lutalo's state law claims, Defendant Wade is accountable, under the doctrine of *respondeat superior* liability and/or the doctrine of strict liability, for the actions and inactions of his deputies, agents and employees.

65.     Medical Staff Defendants were, among other things, required to provide Lutalo and all other inmates/detainees with constitutionally appropriate access to medical care, constitutionally adequate medical care and constitutionally timely medical care.

### COUNT I
**§ 1983 Defendant Wade – Policy or Custom of Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment**

66.     Plaintiff incorporates paragraphs 1 through 63 and 78 through 113 of this Complaint, as if fully set forth herein.

67.     Lutalo Octave, at the time of his death, suffered from schizophreniform disorder, an objectively, sufficiently serious medical condition which was not adequately attended to due to Defendant Wade's unconstitutional policies and practices described herein.

68.     Defendant Wade, in his official capacity, under the color of state law adopted and/or put into effect policies and customs, which were in direct violation of the Eighth Amendment and Fourteenth Amendment, and thus create a culture of deliberate indifference to the serious medical needs of the inmates/detainees in his custody, one of which was Mrs. Octave's decedent, Lutalo.  The policies and customs include:

   a.  allowing employees of the County Jail to obtain and place in jail cells prisoners who are at risk of suicide, without proper and necessary medical and mental health intervention;

b. allowing employees of the County Jail not to remove materials which could be used as an instrument for hanging or otherwise injuring oneself;

c. adopting policies to detain suicidal or potentially suicidal prisoners without obtaining proper medical and psychiatric care for said prisoners; and

d. adopting policies allowing detainees to be placed in camera cells without first ensuring that the camera in the cell is properly functioning.

69.    Pursuant to the above-mentioned policies, procedures, and customs, Defendant Wade directly violated 42 U.S.C. § 1983, by violating the Fourteenth Amendment of the Constitution of the United States, and was deliberately indifferent to the serious needs of Lutalo, in that the Defendant and his employees:

a. failed to adequately monitor Lutalo's welfare when he had a known serious medical condition that needed constant medical treatment and observation;

b. failed to adequately evaluate Lutalo's known medical condition;

c. failed to properly treat Lutalo's known medical condition;

d. failed to place Lutalo in the appropriate psychological facility so that Lutalo's condition could be properly observed and treated;

e. failed to conduct adequate visual observations of Lutalo at the appropriate intervals, in spite of Lutalo's known serious medical condition, and thus failed to observe Lutalo at the time that he was preparing to hang himself;

f. failed to properly recognize that Lutalo was a potential suicide risk and/or to take appropriate steps to prevent infliction of self-harm;

g.   failed to remove materials from Lutalo's cell which he might use to harm himself in spite of the fact that Lutalo had consistently expressed the possibility of self-harm, even mentioning hanging specifically;

h.   failed to take preventive measures to prevent suicides, including proper training of deputies and other jail employees in order to minimize the risk of suicide in the County Jail, such as taking away access to materials which might be used by an inmate or detainee to commit suicide;

i.   failed to adequately staff the County Jail, so that known suicidal prisoners placed in camera cells could be monitored constantly for their safety;

j.   failed to ensure that suicidal prisoners placed in camera cells are only placed in cells with properly functioning cameras;

k.   failed to place Lutalo on 1:1 suicide watch, as would be appropriate for someone having expressed such erratic behavior in conjunction with admitted thoughts of suicide.

70.   Defendant Wade, under color of state law, established aforementioned wrongful policies and procedures and Lutalo died as a direct and proximate result of those policies while in the custody of Defendant Wade.

71.   Defendant Wade committed an Fourteenth Amendment violation by creating and continuing to enforce policies which created a culture of deliberate indifference toward the known risk that psychologically ill detainees, such as Lutalo, might commit suicide due to inadequate surveillance and/or treatment.

72.   During the past decade, there have been at least seven successful inmate/detainee suicides taking place in Henrico County Jails and an unknown amount of

suicide attempts.  Sheriff Wade has been the operator of these jails during each of these suicides.

73.     The absence of the following policies to ensure that medical and psychological treatment was provided to detained persons with serious medical or psychological conditions resulted in Lutalo's death by suicide:

a.   a policy to have persons in custody at the County Jail suffering from serious medical conditions, and exhibiting serious medical or psychological symptoms, such as suicidal tendencies, transported to a facility where proper evaluation and/or treatment for their condition could occur;

b.   a policy to have an appropriate camera cell, which is free of bed sheets or other materials which are regularly used in inmate/detainee suicides, that can be used by those suffering from serious mental conditions and are potentially suicidal;

c.   a policy to have bedding and other potentially harmful materials removed from the cells of any persons who are potentially suicidal;

d.   a policy to have persons who are potentially suicidal placed on a watch cycle more frequent than once every thirty minutes; and

e.   a policy to require jail staff to check the functionality of cameras before any potentially suicidal persons are placed in a camera cell.

74.     Defendant Wade was well aware of the lack of the foregoing policies and was aware that, in absence of such policies, it was likely that a person in his custody suffering from a serious medical/psychological condition, such as Lutalo, would not receive proper monitoring in light of the severity of their condition.

75.     Defendant Wade was aware that new policies or procedures for preventing inmates from committing suicide by hanging were necessary due to the death of 21-year-old Brian Fried, who, like Lutalo, committed suicide by hanging in the Henrico Jail on January 16, 2014.

76.     Upon information and belief, Brian's parents begged the jail and medical staff to provide him with more appropriate mental health care in light of his serious psychological disorder, in a manner similar to how Mrs. Octave begged for Lutalo to receive more appropriate mental health care shortly before Lutalo's death.

77.     Upon information and belief, Brian suffered from bipolar disorder, an objectively serious and known mental health condition. Similar to Lutalo, Brian had a documented history of suicidal ideation which the jail medical staff was aware of.

78.     Similar to Lutalo, Brian had been evaluated by jail medical staff, who had been made aware of his suicidal and mental health history, but was still placed in a cell where he would have access to materials which could be used to commit suicide. Brian hanged himself with a bedsheet from a hanging light fixture.

79.     Based on Brian's suicide by hanging, as well as various other suicides taking place at the County Jail, Defendant Wade knew or should have known that the existing policies for suicide prevention were not constitutionally adequate with regarding to caring for and preventing harm to inmates/detainees suffering from serious mental health conditions.

**§ 1983 Claim Against Sheriff Wade (Supervisory Liability) – Deliberate Indifference
to Serious Medical Needs Resulting in Cruel and Unusual Punishment**

80.     Plaintiff incorporates paragraphs 1 through 77 and 87 through 113 of this
Complaint, as if fully set forth herein.

81.     Defendant Wade, in his official capacity, while acting under color of state
law, was through action and inaction deliberately indifferent to the constitutional rights of
inmates/detainees, including Lutalo.

82.     Defendant Wade was aware that inmates/detainees who suffered from
serious mental health conditions were not being given access to constitutionally safe,
adequate, and appropriate housing, resulting in the detainees' exposure to needless harm
and suffering, but failed to take steps to ensure that such detainees at the County Jail were
afforded access to such adequate housing.

83.     Defendant Wade knew or should have known that the serious medical
condition from which Lutalo was suffering was not being properly addressed and that
without suicide-safe housing, Lutalo was not being given constitutionally appropriate
accommodation.

84.     Defendant Wade failed to take steps to minimize the risk of suicide for
Lutalo, although he knew that previous detainees, such as Brian Fried, had committed
suicide under similar circumstances in the past.

85.     Defendant Wade failed to properly manage and supervise County Jail
operations and failed to ensure that appropriate procedures were in place to prevent
constitutional deprivations at the County Jail, including constitutionally required attention
to serious medical needs and constitutionally appropriate housing for detainees.

86.     Defendant Wade failed to properly supervise jail staff, including Defendant(s) John Doe(s), to such an extent that John Doe(s) allowed Lutalo, a suicidal inmate, to be placed in a camera cell without a functioning camera, thus showing a deliberate indifference to Lutalo's serious medical needs.

87.     Defendant Wade's acts and omissions constitute willful, wanton, reckless, conscious and deliberate indifference and disregard to County Jail inmates/detainees' constitutional rights, such that Lutalo is entitled to recover punitive damages.

88.     WHEREFORE, Defendant Wade's violations of the Fourteenth Amendments to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

## COUNT III
### § 1983 Claim Against Medical Staff and John Doe(s) – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment

89.     Plaintiff incorporates paragraphs 1 through 86 and 98 through 113 of this Complaint, as if fully set forth herein.

90.     The Medical Staff Defendants Dr. Fox, Ms. Tolentino, Mr. Edwards, Ms. Schein, and Nurse Rhoades, in their individual capacities, under the color of State law, acted and carried into effect practices which were in direct violation of 42 U.S.C. § 1983, and which were deliberately indifferent to the serious medical needs of Mrs. Octave's decedent, Lutalo, by knowingly and deliberately failing to properly attend to his serious medical needs.

91.     The Medical Staff Defendants were deliberately indifferent to the known serious medical and mental health needs of Lutalo in that they knowingly and/or recklessly

failed to see and properly treat Lutalo's serious signs of potential suicide risk despite repeated thoughts of suicide, a diagnosis of schizophreniform disorder, consistent auditory hallucinations in which voices gave him orders, and repeated requests from Mrs. Octave that Lutalo be hospitalized.

92.     Medical Staff Defendants each had a duty to exercise reasonable care so as to not infringe upon the constitutional rights of inmates/detainees, including Lutalo.

93.     Medical Staff Defendants were each individually aware that Lutalo was suffering from schizophreniform disorder and that Lutalo had actively described thoughts of suicide.

94.     Medical Staff Defendants were each individually aware, or should have been aware, that persons suffering from schizophreniform disorder, particularly adolescents like Lutalo, are at a significantly increased risk for suicide and other forms of self-harm.

95.     Medical Staff Defendants were each individually aware that, given Lutalo's serious medical condition, he should have been placed on a more frequent watch than once every thirty minutes.

96.     Medical Staff Defendants each individually failed to ensure that the cameras in camera cells were properly functioning before ordering that suicidal detainees be placed there.

97.     Medical Staff Defendants each committed an Fourteenth Amendment violation by deliberately being indifferent to the known risks that Lutalo might commit suicide and thus deprived him of his right to adequate medical care and appropriate housing while incarcerated.

98.     Defendant(s) John Doe(s) each individually had a duty to ensure that inmates/detainees placed in camera cells are only placed in cells with functioning cameras so that they can be properly observed.

99.     Defendant(s) John Doe(s) each individually committed a Fourteenth Amendment violation by deliberately being indifferent to the known risks that Lutalo, who was placed in a camera cell for the purpose of ensuring proper observation due to his suicidal tendencies, might harm himself or commit suicide due to his known mental illness. Thus, the Defendant(s) deprived Lutalo of his constitutional right to appropriate medical care and housing while incarcerated.

## COUNT IV
### State Law Claims Against Defendants Sheriff Wade, John Doe(s) and Medical Staff – Gross Negligence

100.     Plaintiff incorporates paragraphs 1 through 97 and 103 through 113 of this Complaint, as if fully set forth herein.

101.     Because the Defendants were on notice regarding Lutalo's potentially suicidal behavior, the Defendants owed Lutalo a special duty of care while Lutalo was under their custodial arrest, to protect Lutalo's physical safety, including a duty to protect him from self-harm.

102.     In spite of the aforementioned duty, Defendants were grossly negligent in that the Defendants detained Lutalo in a manner whereby he had the ability to hang himself. Defendants further failed to visually observe Lutalo by use of the existing video surveillance system and failed to confiscate items with which he could commit suicide.  As a result thereof, the Defendants were grossly negligent in failing to take all necessary steps to prevent harm to Lutalo.

103.     As a direct and proximate cause of the above, Lutalo, using only materials which he was given access to in his cell, was found hanging.  As a result, Lutalo died while in the Defendants' custody.

104.     By allowing Lutalo, while obviously suffering from an objectively dangerous mental condition, to spend up to thirty minutes at a time alone in a cell with materials which could be used for self-harm and without adequate surveillance, the Defendants acted with such a degree of negligence so as to show a complete disregard for Lutalo's safety.  Their acts constitute a palpable violation of their duty to protect Lutalo's safety.

<u>**COUNT V**</u>
**State Law Claims Against Defendants Medical Staff – Medical Negligence**

105.     Plaintiff incorporates paragraphs 1 through 102 of this Complaint, as if fully set forth herein.

106.     Defendants Medical Staff were at all relevant times employees of the County Jail.  They each worked in the capacity of a healthcare provider in their interactions with Lutalo.

107.     Each member of the Medical Staff had duties to administer medical care and treatment to Lutalo in conformity with the standards of delivery of medical care and treatment in Henrico County and the Commonwealth of Virginia.

108.     Dr. Fox, in particular, as the only LCP working with Lutalo, had a special duty to ensure that his subordinates understood the suicide risks associated with Lutalo's symptoms. Dr. Fox had a duty to ensure that his subordinates provided Lutalo with the adequate medical care and accommodation that he was entitled to.

109. Dr. Fox further had a duty to create a proper and medically adequate plan for addressing the mental health needs of inmates/detainees. A failure to create and communicate such a plan to subordinates constitutes medical negligence.

110. As a result of the negligence of the Medical Staff, Lutalo was caused to be placed in a cell with inadequate surveillance and allowed to have access to materials which he later used to commit suicide.

111. The failure of the Medical Staff to provide proper medical care to Lutalo caused him to suffer serious and unneeded pain as well as serious injuries which resulted in his death.

112. The condition(s) from which Lutalo suffered and died were caused by the negligence of the Medical Staff Defendants, including but not limited to:

a. failure to properly diagnose Lutalo as imminently suicidal;

b. failure to maintain Lutalo in a 1:1 watch suicide cell;

c. failure to order proper surveillance of Lutalo;

d. failure to ensure that the camera cell used by Lutalo had a properly functioning camera;

e. failure to order removal of materials which are known to be used by potentially suicidal inmates for self-harm;

f. failure to properly inform other jail staff of Lutalo's serious mental conditions and/or threats of suicide;

113. As a direct and proximate result of these actions and/or omissions by these Defendants, Lutalo suffered severe and permanent injuries resulting his untimely death.

114.     As a direct proximate result of these Defendants' grossly negligent conduct, Lutalo was subject to needless and unusual suffering, pain, mental anguish, and medical bills.

115.     As a direct and proximate result of these Defendants' grossly negligent conduct, the surviving beneficiaries of Lutalo have suffered and will continue to suffer sorrow, mental anguish, loss of companionship, loss of comfort and guidance, medical bills, funeral bills, loss of income and support and other related bills and expenses.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of TWENTY MILLION DOLLARS ($20,000,000.00), for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

WHEREFORE, the Defendants' conduct, having been so willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff demands the award of punitive damages against all Defendants, jointly and severally, in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.


**TRIAL BY JURY IS DEMANDED.**

Respectfully filed,

**GLORIA JUANITA OCTAVE**
*ADMINISTRATRIX* **of**
**the ESTATE OF LUTALO OCTAVE**

_____/s/_____
Seth R.  Carroll (VSB No.  74745)
Commonwealth Law Group, LLC
1506 Staples Mill Road
Suite 202
Richmond, VA 23230
Phone: (804) 387-6212
Facsimile: (866) 238-6415
scarroll@hurtinva.com

Jonathan E. Halperin - VSB No. 32698
Andrew Lucchetti – VSB No. 86631
Isaac McBeth – VSB No. 82400
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
(804) 527-0100
(866) 335-1502 facsimile
jonathan@halperinlegal.com
andrew@halperinlegal.com
isaac@halperinlegal.com
*Counsel for Plaintiff*