**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GLORIA JUANITA OCTAVE          :
*ADMINISTRATRIX* of            :
the ESTATE OF LUTALO OCTAVE,   :
                               :
    Plaintiff,          :
                               :
v.                             :          Case No.: 3:16-cv-338 – JAG
                               :
SHERIFF MICHAEL L. WADE,       :          JURY TRIAL DEMANDED
                               :
And                            :
                               :
DEPUTY ELIZABETH LEE           :
                               :
    Defendants.         :

**AMENDED COMPLAINT**

COMES NOW Plaintiff, Gloria Juanita Octave ("Plaintiff" or "Mrs. Octave") as *Administratrix* of the Estate of Lutalo Octave (the "Estate") by counsel, pursuant to Rule 15(a)(2) and the Order of the Court (ECF No. 16), and moves this honorable Court for judgment against Sheriff Michael L. Wade ("Wade") and Deputy Elizabeth Lee ("Lee")[1]. In support of her Complaint, Plaintiff states as follows:

**INTRODUCTION**

1.   This Complaint asserts claims pursuant to 42 U.S.C. § 1983, as well as claims pursuant to Virginia's wrongful-death and survival claims statutes, regarding the death of Lutalo Octave.

---

[1] All parties stipulate and consent pursuant to Rule 15(a)(2) that Deputy Lee should be added as a party defendant.

2.      Lutalo Octave is survived by statutory beneficiaries under Virginia's wrongful death statute (Virginia Code § 8.01-50 and § 8.01-53).

3.      This Complaint details violations of the Fourteenth Amendment of the Constitution of the United States of America by Defendants, jointly and severally, occurring in the Henrico County Regional Jail West ("County Jail").

4.      This Complaint further details gross negligence by the Defendants, all of whom are responsible, jointly and severally, for gross negligence under Virginia state law resulting in Lutalo's death.

5.      Defendant Wade was responsible for operating the County Jail so as to not endanger the health and safety of those incarcerated or detained there.  Wade failed to provide constitutionally adequate conditions of confinement to inmates detained there, including Lutalo.

6.      Collectively, Defendants failed to provide necessary, adequate and timely attention in response to Lutalo's serious medical needs.  Through action and inaction, Defendants failed to prevent and directly caused Lutalo's fatal injuries through their gross negligence and deliberate indifference to human life, in violation of his constitutional rights.

## **JURISDICTION**

7.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over Lutalo Octave's 42 U.S.C. § 1983 claims.

8.      This Court has jurisdiction over these claims as they arise under the Constitution of the United States of America and have been brought before this Court pursuant to 42 U.S.C. § 1983.

9.     This Court has supplemental jurisdiction over the related state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the alleged claims arising under Virginia law are so related as to form part of the same case or controversy arising under Lutalo Octave's 42 U.S.C. § 1983 claims.

## VENUE

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to the Estate's claims occurred in this District.

11.     Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## PARTIES

12.     Plaintiff Gloria Octave is a citizen of the United States, and is a resident of Henrico County, Virginia.  She is the Personal Representative of the Estate of Lutalo Octave, deceased.  Letters of Administration were granted to Mrs. Octave by the Circuit Court of Henrico County on December 4, 2015.

13.     Mrs. Octave has brought this action in her capacity as Personal Representative of the Estate of Lutalo Octave.

14.     The Plaintiff's decedent is Lutalo Octave, who at the time of his death, was a nineteen year old citizen of the United States, and a resident of Henrico County, Virginia. Lutalo died on September 19, 2015 as a result of wrongful and unconstitutional acts of the defendants.

15.     At the time of the incident, Defendant Michael Wade was Sheriff of Henrico County.  In that capacity, Wade was charged with providing security for Henrico's two regional jails, including the County Jail in which Lutalo died.  At all times while Lutalo was detained at the County Jail, Sheriff Wade had a duty to maintain the custody and ensure the care of Lutalo, and otherwise delegated that duty to his deputies, agents and employees.  Sheriff Wade is the official responsible for setting and enforcing the policies, customs, and practices of the County Jail.  Sheriff Wade is sued in his individual and official capacities for his own culpable action or inaction in the training, supervision, or control of his subordinates and for his acquiescence in the constitutional deprivations which this Complaint alleges, and for conduct that showed a reckless or callous indifference to the rights of others.  Sheriff Wade is sued in his individual and official capacities as charged herein.

16.     Defendant Lee was a deputy sheriff and employee of the Sheriff Wade.  As a deputy sheriff, Deputy Lee was required to supervise, monitor, and provide access to medical/mental health treatment to the inmates and detainees.  Deputy Lee effectively totally ignored Mr. Octave, despite the fact that he was supposed to be observed for behavior changes and to respond to threats or attempts to commit self-harm.  At all times, Deputy Lee was acting in the course of her employment as a deputy sheriff.

17.     All Defendants are persons acting under color of state law pursuant to 42 U.S.C. § 1983.

## **FACTS**

18.     Lutalo Octave was born on August 30, 1996.

19.     Lutalo was the son of Gloria Octave, the Plaintiff.  He was, at the time of his arrest, living with his parents in their home in Henrico County.

20.     Lutalo was arrested and housed at the County Jail on or about August 14, 2015 as a pre-trial detainee.

21.     At the time of his death, Lutalo suffered from a serious medical condition. In particular, he suffered from a psychiatric disorder, was depressed and suicidal.  Shortly before his death, he had been diagnosed as suffering from schizophreniform disorder (alternatively documented as schizophrenia – paranoid type), a form of psychosis with a known correlation to increased risk of suicide.

22.     On August 19, 2015, Mrs. Octave and her friend Pastor Gail Townes called the jail to request that Lutalo be given a mental health evaluation.  Mrs. Octave informed jail staff that Lutalo had recently dropped out of school, and that he had started acting aloof, quiet, withdrawn, and otherwise unusual.  She advised a mental health employee named Christine Schein that Lutalo's crime, setting fire to his own home, was extremely unusual and out of character.

23.     Later that day, Lutalo was given a brief mental health evaluation by jail medical staff.  The staff member, Augustus Edwards, noted that Lutalo was engaged in a process called "thought blocking" and that he was giving repetitive, confusing answers to his questions.

24.     On August 20, 2015, Lutalo was given a follow-up mental health evaluation by Nurse Ashley Rhoades.  She noted Lutalo as being guarded, paranoid, and "thought blocking."  Lutalo explained that he had hallucinations, may have been experiencing

delusions, and that he "noticed things" that no one else notices.  Lutalo requested help from doctors to "stop the voices."

25.     After this meeting with Nurse Rhoades, Lutalo was prescribed Haldol and Cogentin.

26.     On August 25, 2015, Lutalo met with Mr. Edwards again.  During this meeting, Mr. Edwards noted that Lutalo was having thoughts of self-harm and had difficulty thinking of reasons to live.

27.     On August 26, 2015, Lutalo was seen by another member of the medical staff, Christine Gray, at the request of booking, due to reports of strange behavior and continued hearing of voices.

28.     On August 27, 2015, Mr. Edwards noted Lutalo's reasons for leaving his studies at the Virginia Commonwealth University.  According to Lutalo, the government had implanted nanotechnology in his brain during a protest he attended.  He reported that he was experiencing loud noises in his head and suffering from involuntary movements.  Lutalo also reported that the voices in his head were getting louder and actively giving him commands.  Lutalo further indicated that shortly before his incarceration, a friend of his father possibly had sexually harassed him, but that only he could see what this friend was doing to him.

29.     Also on August 27, 2015, Ms. Schein, informed Plaintiff that her son had had "his first psychotic episode."

30.     On August 28, 2015, Dr. Louis Fox diagnosed Lutalo as suffering from schizophreniform disorder.  Schizophreniform disorder is a form of psychosis with symptoms similar to schizophrenia.

31.     People suffering from schizophreniform disorder, particularly those suffering from their first episode of psychosis, are at a substantially increased risk of suicide.

32.     On August 29, 2015, Lutalo told Deputy Emanuel, a County Jail employee, that he wanted help with assisted suicide.  Deputy Emmanuel reported this to mental health.  Lutalo was subsequently seen by Nurse Deborah Taylor who noted that Lutalo indicated he "has nothing to live for" and wanted to commit suicide.  She noted that Lutalo had asked a doctor about assisted suicide and requested to be transferred to a state where he could receive such assistance.  Lutalo stated that all he could think about was wanting to die.  At this point, Lutalo was moved into 1:1 suicide watch due to his suicidal statements.

33.     On August 31, 2015, in a meeting with another member of the medical staff, Jessica Henderson, Lutalo was asked about his previous statements on assisted suicide.  Lutalo admitted that he had been seeking information on how he might legally kill himself.  Lutalo reported that he was feeling depressed and hopeless and that suicidal ideation "comes and goes." During this meeting, Lutalo stated "I just don't want to live" and requested transfer to a state that allows assisted suicide.

34.     Also on August 31, 2015, the same day that Lutalo stated "I just don't want to live" and requested a transfer to a state which would assist him in committing suicide, Lutalo was inexplicably cleared for transfer by Mr. Edwards out of 1:1 Mental Health Watch into the Mental Health Dayroom, with instructions to watch him once every 30 minutes "with no restrictions."

35.     Lutalo's patient encounter records obtained from the Medical Staff do not indicate that anyone met with him between August 31 and September 9, 2015.

36.     On September 9, 2015, Lutalo told Mr. Edwards that he was currently experiencing suicidal ideation and would allow someone else to hurt him.

37.     On September 10, 2015, in a conversation with Ms. Tolentino, Lutalo explained that he was still hearing voices.  *Lutalo told Ms. Tolentino that he had recently had suicidal thoughts and that if he were to harm himself, **he would do so by hanging himself**.*  During this meeting, Lutalo requested a transfer away from general population to isolation so he could be alone.  Ms. Tolentino recommended that Lutalo be relocated to a camera cell for "improved supervision" and in order to "*monitor* his behaviors **more closely**."

### 2ROC-1: A Camera Cell Without a Working Camera

38.     On September 11, 2015, despite the medical requirement that Lutalo be placed in a "camera cell" in order to have "improved supervision" to "monitor his behaviors more closely," Lutalo was placed in cell 2ROC-1, a cell with a non-functioning camera. Upon information and belief, Sheriff Wade and his agents were aware that the camera was not working and had not been working since approximately April 22, 2015.

39.     On or about April 22, 2015, an inmate damaged the camera in 2ROC-1 with a water soaked bedsheet.  A work order for repair was prepared and the inmate was charged with vandalism.  However, the camera in 2ROC-1 was never repaired prior to September 19, 2015, and was known to not be functioning at the time Mr. Octave was placed in 2ROC-1.  Accordingly, Sheriff Wade and his agents knowingly allowed mentally ill inmates to be placed in a cell designed for camera observation from April 22, 2015, until the time of Lutalo's death, despite the fact that the camera was not operational.

40.     In particular, Lutalo was placed in 2ROC-1 contrary to orders from mental health that he be placed in a cell with a functioning camera for increased observation and monitoring due to his expressed suicidal tendencies.  At the time Lutalo was transferred into 2ROC-1, Sheriff Wade was allowing the cell to continue to be used despite the fact that the camera had been non-operational for nearly five months.

41.     Lutalo was kept in 2ROC-1 for nine days until his death, without increased observation and monitoring by virtue of a functioning camera, and despite ongoing and increasing reports of suicidal ideation.

42.     A September 11, 2015 "Psychiatry Note" indicates that Lutalo was experiencing continued symptoms of depression.  The "Psychiatry Note" further indicates that *Lutalo denied having the means to kill himself, but could not "contract for safety" if he were to acquire the means to kill himself.*

43.     On September 16, 2015, Plaintiff contacted the County Jail again and talked with Ms. Schein.  Plaintiff indicated that her son, Lutalo, should be transferred to the Medical College of Virginia for inpatient treatment.  Plaintiff was informed that the jail could not transfer him there without a judge authorizing Lutalo's release.

44.     On September 16, 2016, Lutalo requested that he be moved back to general population, but was not approved for transfer because his condition continued to require extra monitoring.

45.     On September 17, 2016, Lutalo reported to Ms. Tolentino that he was still having auditory hallucinations and that he must "distract himself" in order to get rid of these thoughts.  Lutalo stated that he had thoughts of self-harm once or twice per hour.  Ms. Tolentino ordered that Lutalo "remain in a ***camera cell*** for continued ***monitoring***."

46.     Despite Lutalo's continued hallucinations, thoughts of self-harm, and his report from one week earlier that he might hang himself, Lutalo was left in 2 ROC-1 without a functioning camera.  The cell had a high shelf on the wall.  He was given a towel and a bedsheet.

47.     In fact, in an investigative memorandum drafted by Investigator Herbert (the "Herbert Memo") and dated October 13, 2015, confirms that the "camera in 2ROC-1 was damaged by water on 4/22/15 and had not been repaired," and, therefore, that the "Camera [was] *inoperable* since 4/22/15."

### Deputy Lee Does Not Monitor Lutalo on September 19, 2015

48.     On September 19, 2016, Lutalo was found hanging from a bedsheet tied to the metal shelf in his cell.  He was found at 11:56 AM by Inmate Michael Boyer, who was going to retrieve Lutalo's food tray from his cell.

49.     Video from the hallway outside 2ROC-1 confirms that in the hours leading up to Lutalo's death, Deputy Lee failed to conduct appropriate security rounds and failed to adequately monitor Lutalo, despite the fact that the camera in Lutalo's cell was not functioning.

50.     Knowing the Deputy Lee could not see Lutalo on camera monitors, she would only have been able to observe him by physically making security rounds.

51.     The Virginia Department of Corrections promulgates Minimum Standards for Jails and Lockups which apply to the County Jail.  These standards require, among other things:

> *The facility shall provide 24-hour supervision of all inmates by trained personnel.  All inmate housing areas shall be inspected a minimum of twice per hour at random intervals between inspections.  All inspections and unusual incidents shall be documented.  No obstructions shall be placed in*

*the bars or windows that would prevent the ability of jail staff to view inmates or the entire housing area.*

6VAC15-40-1040.

52.     Similarly, County Jail Post Orders for the area of the jail containing 2ROC-1 require that "individual isolation logs checks shall be conducted every 30-minute [sic] on an irregular rotation."

53.     Upon information and belief, Deputy Lee began her shift on September 19, 2015 sometime between approximately 0700 and 0715 hours.

54.     Tragically however, video surveillance from the hallway outside 2ROC-1 does not show Deputy Lee in the hallway at least once every 30 minutes, but rather only **three** times between 0715 and 1156 hours:

a.     0822 hours Deputy Lee enters a door at the beginning of the hallway, but does not go near the door to 2ROC-1.  Deputy Lee exits the door at 0827, carrying a piece of paper in her right hand, she then re-enters and exits the door a second time.

**b.     0828 hours Deputy Lee walks down to the area outside 2ROC-1 carrying a piece of paper in her right hand (#1).**

**c.     0857-0858 hours Deputy Lee and a nurse enter and exit the area of 2ROC-1 (#2).**

d.     0938 hours Deputy Lee walks halfway down the hall, but does not go down the hallway to 2ROC-1.  Instead, she opens a door in the hallway, enters, and can then be seen walking back toward the deputy station drying her hands with a paper towel.

e.  0952-0953 hours Deputy Lee and an inmate with a mop bucket enter and exit the same door Deputy Lee entered at 0938 hours, but Deputy Lee does not proceed down the hallway to 2ROC-1, and instead proceeds back toward the deputy station.

f.  1034 hours Deputy Lee is seen near the deputy station carrying a piece of paper in her right hand.  She enters a door near the beginning of the hallway.  She exits the door at 1036 hours, still carrying the paper, and walks back to the deputy station.  She does not proceed down the hallway to 2ROC-1.

g.  1041 hours Deputy Lee enters a door in the hallway near the door she entered at 0938 hours.  She exits at 1045 hours, but never goes down the hallway to 2ROC-1.

h.  1050-1051 hours Deputy Lee enters a door that appears to be the same one she entered at 0938 hours.  She does not go down the hallway to 2ROC-1.

i.  **1108-1111 hours Deputy Lee can be seen passing food trays.  At 1111 hours, she passes a tray in the area of 2ROC-1 (#3).  According, to a later report, Lutalo did not speak to Deputy Lee when she placed the tray in his door slot.**

j.  1139-1140 hours Deputy Lee again enters a door that appears to be the same one she entered at 0938 hours.  She does not go down the hallway to 2ROC-1.

k.  1156 hours Inmate kitchen trustee Michael Boyer enters the area to retrieve the lunch trays and runs back to the deputy station where he looks through the window and motions urgently holding his hands up to his neck.  Deputy Lee can then be seen walking down to the area outside 2ROC-1.

55.     The documents tell a more confusing story.  In one set of records, Deputy Lee records the following observations of Lutalo:

| | | |
|---|---|---|
| 09/19/2015 07:45 | LEE, ELIZABETH V. | head count by name |
| 09/19/2015 08:10 | LEE, ELIZABETH V. | laying down on bunk, |
| 09/19/2015 08:51 | LEE, ELIZABETH V. | laying down |
| 09/19/2015 09:04 | LEE, ELIZABETH V. | Nurse Miller in area passing meds. |
| 09/19/2015 09:45 | LEE, ELIZABETH V. | laying down on floor in cell on mattress  . . . |

56.     Then, in another document, with the same comments, different times are reported:

LUTALO CURTIS OCTAVE

| OBSERVATION_DATE | OBSERVATION_BY | COMMENTS | When done |
|---|---|---|---|
| 09192015 07:09 | ELIZABETH LEE | head count by name | 09192015 09:09 |
| 09192015 08:09 | ELIZABETH LEE | laying down on bunk, | 09192015 09:09 |
| 09192015 08:09 | ELIZABETH LEE | laying down | 09192015 09:09 |
| 09192015 09:09 | ELIZABETH LEE | Nurse Miller in area passing meds. | 09192015 09:09 |
| 09192015 09:09 | ELIZABETH LEE | laying down on floor in cell on mattress | 09192015 10:09 |

57.     A handwritten log believed to be from September 19, 2015 shows yet another set of times apparently recorded by Deputy Lee:

POD/DR: _2ROC-Cell 1 & 2_
OR AREA _Shu_

| HEADCOUNT | | | | | WALL INSPECTION | | |
| TIME | COUNT | DEPUTY | VERIFIED BY: | | TIME | DEPUTY | ASSISTED BY: |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 0743 | 2 | Lee | Brown | | 0743 | Lee | |
| 1010 | 2 | Lee | Gilmore | | | | |

| SECURITY CHECKS | | | | | | | | | | | | | | | |
| TIME | D/S | TIME | D/S | TIME | D/S | TIME | D/S | TIME | D/S | TIME | D/S |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 0721 | Lee | 0943 | Lee | | | | | | | | |
| 0743 | Lee | 1010 | Lee | | | | | | | | |
| 0811 | Lee | 1038 | Lee | | | | | | | | |
| 0847 | Lee | 1104 | Lee | | | | | | | | |
| 0908 | Lee | 1133 | Lee | | | | | | | | |

**FOOD SCHEDULE**

| | | | |
| --- | --- | --- | --- |
| BREAKFAST: | START: N/A | END: N/A | BREAKFAST METHOD: ☐ FOOD TRAY / ☐ CHOW HALL (CIRCLE ONE) |
| LUNCH: | START: 1120 | END: 1145 | LUNCH METHOD: ☐ FOOD TRAY / ☐ CHOW HALL (CIRCLE ONE) |
| DINNER: | START: | END: | DINNER METHOD: ☐ FOOD TRAY / ☐ CHOW HALL (CIRCLE ONE) |

NIGHTLY LOCKDOWN CONDUCTED AT: _N/A_ .          MORNING RELEASED AT: _N/A_ .

**POST ASSIGNMENT CHECKLIST**

| 5.26 Post Order on Post | 4.2 Daily Recreation Turned In | All Keys Account For | First Aid Kit on Post & Tab Locked | Telephone Working | Cut Down Knife |
| --- | --- | --- | --- | --- | --- |
| ☑ YES ☐ NO | ☐ YES ☐ NO | ☑ YES ☐ NO | ☑ YES ☐ NO | ☑ YES ☐ NO | ☐ YES ☑ NO |

**5.35 Security Checks Twice an Hour:**
Inspection of all inmates in housing units should be conducted twice an hour on a random basis.
☑ Checked Off

58.     Yet, as detailed above, the video reveals that Deputy Lee only walked down to 2ROC-1 at 0828, 0857, and 1111 hours on September 19, 2015.

59.     Although Lutalo initially had a weak pulse after he was cut down from the sheet he was hanging from, he was pronounced dead at 1242 hours on September 19, 2015. The medical examiner identified the cause of death as: "Hanging."  At the time of his death, he was suffering from schizophreniform disorder, an objectively serious mental disorder which altered his ability to make decisions.  Thus, Lutalo was not of sound mind at the time of his death and did not voluntarily end his own life.

60.     In what appears to be the second of two handwritten statements Deputy Lee prepared following Lutalo's death, she states that a "kitchen worker" told her that an inmate had a "towel around his neck," and that she observed Lutalo in "ROC-Cell #1 whith a sheet around his neck, tie to the hook where you'll towel [sic] towels hang at."  She then goes

on to say that she later talked to the investigators and as she was talking to them "felt nerves from I didn't feel right.  I began to talked [sic] in sentences that didn't make sense.  I began to wet my pant [sic].  I asked them to take my weapon."

61.    Deputy Lee was unable to complete a subsequent interview with investigators on October 9, 2015, because "At the time of the interview, Deputy Lee became physically sick and distraught and so we concluded the interview so that she may receive medical attention."

62.    Subsequently, on October 12, 2015, Deputy Lee participated in another investigative interview in which she stated that this incident was "especially hard for her because this inmate was her neighbor and that she still lives next to his parents burned house."  She further stated that "**her house was the next one to catch on fire had it spread any further.**"  She stated that after Lutalo's death she "**voluntarily turned her weapon over**," because "**she didn't even want to look at it and <u>be reminded</u>.**"  She also stated that she was "paranoid at home that she will be confronted by the Octave family" and had a "speech that she has prepared to say to them if that should happen."

## DEFENDANTS' DUTIES

63.    At all times relevant to this action, all Defendants had duties to Lutalo Octave, an inmate, pursuant to the Fourteenth Amendment of the United States Constitution and also under Virginia law as described herein.

64.    Defendants Wade and Deputy Lee were required to provide Lutalo, and all other inmates/detainees, with constitutionally appropriate access to medical care and constitutionally appropriate housing.  All Defendants were obligated to take reasonable measures to provide for Lutalo's safety.

65.     Defendants Wade and Deputy Lee also owed statutory and common law duties of care to Lutalo, including affirmative duties to provide adequate and safe conditions of detention.

66.     Deputy Lee, as jail staff, has a constitutional duty not to act with deliberate indifference toward the legitimate medical or mental health needs of all inmates/detainees, including Lutalo.

67.     Defendant Wade has a constitutional obligation to not maintain, condone or otherwise permit unconstitutional conditions of confinement for those housed in the County Jail.

68.     Particularly, Defendant Wade is responsible for the day-to-day operations and maintenance of the County Jail.

69.     Defendant Wade had the duty of care and custody for Lutalo.  While Lutalo was confined in the County Jail, he was in the custody and under the care of Defendant Wade and his deputies, employees and agents, including Defendants.

70.     Defendant Wade, by and through his deputies and Medical Staff Defendants, had statutory duties to provide proper medical treatment to Lutalo under Virginia Code § 53.1-126.  Under that statute, the Sheriff and jail personnel have a specific responsibility to inmates/detainees that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions."

71.     In connection with Lutalo's state law claims, Defendant Wade is accountable, under the doctrine of *respondeat superior* liability and/or the doctrine of strict liability, for the actions and inactions of his deputies, agents and employees.

## COUNT I
### § 1983 Defendant Wade –Deliberate Indifference to Conditions of Confinement and Serious Medical Needs

72.     Plaintiff incorporates paragraphs 1 through 71 and 84 through 107 of this Complaint, as if fully set forth herein.

73.     Lutalo Octave, at the time of his death, suffered from schizophreniform disorder, an objectively, sufficiently serious medical condition which required special monitoring.

74.     Additionally, medical and or mental health staff had ordered that Lutalo be placed in a camera cell for his own safety.

75.     Upon information and belief, Defendant Wade, in his official capacity, under the color of state law permitted a custom or practice to perpetuate at the jail where inmates requiring camera observation by order of medical or mental health professionals could be housed in camera cells without functioning cameras.

76.     Specifically, from at least April 22, 2015 through September 19, 2015, Sheriff Wade approved, acquiesced to or tolerated the assignment of inmates/detainees, including Lutalo Octave, who had documented serious mental health illnesses and who needed camera monitoring to be housed in a cell without a functioning camera.

77.     In fact, Lutalo Octave was assigned to and housed in a cell with a broken camera for approximately nine days, despite continued orders from medical/mental health professionals that he receive extra monitoring and increased observation by virtue of being in a cell with a functioning camera.

78.     Upon information and belief, Lutalo would have survived had he been observed on camera and responded to before 1156 hours on September 19, 2015.

Consequently, Lutolo died as a direct and proximate result of his assignment to a cell without a functioning camera.

79.     Defendant Wade violated the Fourteenth Amendment violation by tolerating conditions of confinement that posed a serious risk of harm to and was deliberately indifferent to the mental health needs of psychologically ill inmates and detainees, such as Lutalo, who were known suicide risks due to mental illness and, therefore, required additional surveillance.

80.     During the past decade, there have been at least seven successful inmate/detainee suicides in Henrico County Jails and an unknown amount of suicide attempts.  Sheriff Wade has been the operator of these jails during each of these suicides.

81.     Further, Defendant Wade failed to implement or enforce any policy or procedure requiring jail staff to check the functionality of cameras before placing suicidal inmates in need of additional monitoring in a designated camera cell.

82.     Defendant Wade was well aware that, in the absence of such a policy, it was likely that a person in his custody suffering from a serious medical/psychological condition, such as Lutalo, would not receive proper monitoring and would be exposed to a needless and unnecessary risk of serious harm.

83.     WHEREFORE, Defendant Wade's violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

## COUNT II

**§ 1983 Claim Against Deputy Lee - Deliberate Indifference to Serious Medical Need**

84.     Plaintiff incorporates paragraphs 1 through 83 and 97 through 107 of this Complaint, as if fully set forth herein.

85.     Defendant Lee was deliberately indifferent to Lutalo's basic human needs during his confinement, including his need for access to medical or mental health care, amounting to a violation of Lutalo's Fourteenth Amendment rights.

86.     Upon information and belief, Defendant Lee knew Lutalo required additional monitoring and observation based on his threats of self-harm.  She further knew that Lutalo was housed in a cell without a functioning camera.  She knew that even inmates in general population required physical safety and security checks *at least every thirty minutes*.

87.     Due to the broken camera in 2ROC-1, Deputy Lee knew that she could not monitor or observe Lutalo unless she physically walked down to 2ROC-1 and looked in the window.  Deputy Lee knew that Lutalo was assigned to a camera cell for *additional* monitoring and observation.  Yet Deputy Lee did not even monitor or observe Lutalo twice an hour, which is the minimum required by state administrative regulations and County Jail procedure for *all inmates*.

88.     Despite these facts, for reasons known only to her, Deputy Lee only observed Lutalo three times in a four and a half hour period on September 19, 2015.

89.     The last time Deputy Lee saw Lutalo was at 1111 hours, when she placed a meal tray in his door slot and he did not speak to her.

90.     No one saw Lutalo again until 1156, when inmate Boyer observed Lutalo hanging in his cell during food tray collection.

91.     By the time Deputy Lee responded to inmate Boyer's report and called a medical emergency, it was too late.  Despite the efforts of rescuers, Lutalo was pronounced dead at 1242 hours on September 19, 2015.

92.     The cause of death was "Hanging" according to the medical examiner.

93.     Deputy Lee's failure to monitor and respond to Lutalo's objectively serious medical/mental health needs, in the face of a subjectively known risk of harm amounts to deliberate indifference to Lutalo's serious medical needs.

94.     Deputy Lee's deliberate indifference to Lutalo's obvious serious medical needs was a direct proximate cause of his death, insofar as Deputy Lee's failures to act delayed or prevented Lutalo's access to life saving medical care.

95.     Deputy Lee's actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Lutalo's constitutional rights, such that Plaintiff is entitled to recover punitive damages.

96.     WHEREFORE, Deputy Lee's violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

## <u>COUNT III</u>
**State Law Claims Against Defendants Sheriff Wade and Deputy Lee – Gross Negligence**

97.     Plaintiff incorporates paragraphs 1 through 96 of this Complaint, as if fully set forth herein.

98.     Defendant Wade is liable for his own acts and omissions, and is also vicariously liable under the doctrine of *respondeat superior* for the acts and omissions of his deputies and employees, including Deputy Lee.

99.     Defendant Wade and Defendant Lee, as described herein, breached their duties to Lutalo and acted with willful and wanton disregard to his safety or were otherwise grossly negligent in monitoring Lutalo and addressing her serious medical needs.

100.    The facts demonstrate that Sheriff Wade completely neglected Lutalo's safety by allowing him to be placed in a cell without a functioning camera.

101.    The facts demonstrate that Deputy Lee completely and willfully failed to monitor Lutalo.

102.    While incarcerated at the County Jail, Lutalo was reliant on the care of Defendant Wade and his deputies, including the Deputy Lee.  These Defendants had a duty to exercise reasonable care with regard to Lutalo while he was confined in the County Jail.  These Defendants had specific duties to reasonably ensure that Lutalo was not subject to unnecessary suffering and that he had reasonable access and attention to his medical needs.

103.    Because the Defendants were on notice regarding Lutalo's potentially suicidal behavior, the Defendants owed Lutalo a special duty of care while Lutalo was under their custodial arrest, to protect Lutalo's physical safety, including a duty to protect him from self-harm.

104.    In spite of the aforementioned duty, Defendants were grossly negligent in that the Defendants housed Lutalo in a manner whereby he had the ability and opportunity to hang himself without rescue.  Defendant Lee willfully and wantonly failed to visually

observe Lutalo by use of the existing video surveillance system and failed to make physical security checks as required by state law and jail procedure.

105.   As a direct and proximate result of being housed in a cell without a functioning camera, Lutalo's suicide attempts were unobserved and his rescue delayed long enough for him to die.

106.   As a direct and proximate result of Deputy Lee's failure, Lutalo, using only materials which he was given access to in his cell, hanged himself without Deputy Lee noticing or calling for timely rescue.  Consequently, Lutalo died while in the Defendants' custody.

107.   By allowing Lutalo, while obviously suffering from an objectively dangerous mental condition, to spend forty-five or more minutes at a time alone in a cell with materials which could be used for self-harm and without adequate surveillance, Deputy Lee acted with such a degree of negligence so as to show a complete disregard for Lutalo's safety.  In fact, her actions (or inaction) was a willful and wanton violation of her duty to protect Lutalo.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of TWENTY MILLION DOLLARS ($20,000,000.00), for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

WHEREFORE, the Defendants' conduct, having been so indifferent, willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff demands the award of punitive damages against all Defendants, jointly and severally, in a

just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.


**TRIAL BY JURY IS DEMANDED.**

Respectfully filed,

**GLORIA JUANITA OCTAVE**
***ADMINISTRATRIX* of**
**the ESTATE OF LUTALO OCTAVE**


_____/s/_____
Seth R.  Carroll (VSB No.  74745)
Commonwealth Law Group, LLC
1506 Staples Mill Road
Suite 202
Richmond, VA 23230
Phone: (804) 387-6212
Facsimile: (866) 238-6415
scarroll@hurtinva.com

Jonathan E. Halperin - VSB No. 32698
Andrew Lucchetti – VSB No. 86631
Isaac McBeth – VSB No. 82400
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
(804) 527-0100
(866) 335-1502 facsimile
jonathan@halperinlegal.com
andrew@halperinlegal.com
isaac@halperinlegal.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of February, 2017, I have electronically filed the foregoing using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

Jospeph P. Rapisarda, Jr., Esq.
County Attorney
John D. McChesney, Esq.
Assistant County Attorney
Office of the County Attorney
Henrico County
P.O. Box 90775
Henrico, Virginia 23273
*Counsel for former Defendants Edwards, Tolentino, Rhoades, Schein and Fox*

Leslie A. Winneberger, Esq.
William Etherington, Esq.
Beale, Davidson, Etherington & Morris, P.C.
701 E. Franklin Street
Suite 1200
*Counsel for Defendant Sheriff Wade*


_____/s/_____
Seth Carroll